IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br><br>  vs.<br><br><br>NOVUS TECHNOLOGIES, LLC; RALPH W. THOMPSON, JR.; DUANE C. JOHNSON; RCH2, LLC; ROBERT CASEY HALL; and ERIC J. WHEELER,<br><br>    Defendants,<br><br>  and<br><br>U.S. VENTURES, LLC; U.S. VENTURES INTERNATIONAL, LLC; ROBERT L. HOLLOWAY; ONLINE STRATEGIES GROUP; and DAVID STORY,<br><br>    Relief Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:07-CV-235-TC |

   This matter comes before the court on Plaintiff Securities and Exchange Commission's

motion for summary judgment against Defendant Ralph W. Thompson, Jr., who was the

managing member of Co-Defendant Novus Technologies, LLC.[1]  The SEC alleges that Mr.

Thompson sold unregistered securities, violated the anti-fraud provisions of the federal securities

laws, and acted as an unregistered broker-dealer.  In its motion, the SEC seeks an order finding

---

[1]Novus Technologies, LLC is now in receivership.

liability and requiring Mr. Thompson to disgorge himself of ill-gotten gains, pay prejudgment interest, and pay a third tier penalty.[2]

Mr. Thompson defends against the motion by (1) challenging the SEC's conclusion that Novus's promissory notes and joint venture agreements were "securities" governed by the federal securities laws; (2) asserting that he did not act with the requisite fraudulent state of mind; and (3) maintaining that he did not profit from any ill-gotten gains and the SEC has not proven otherwise.

The court holds that Novus's promissory notes and joint venture agreements were investment contracts which, by definition, are "securities" governed by the federal securities laws. Furthermore, the court finds it undisputed that Mr. Thompson (1) acted as a securities broker-dealer but was not registered, (2) sold unregistered securities, and (3) made material misrepresentations or omitted material information regarding the nature and value of those securities. Accordingly, the SEC is entitled to summary judgment on the issue of Mr. Thompson's strict liability under Securities Act of 1933 ("Securities Act") Sections 5(a) and 5(c),[3] Securities Exchange Act of 1934 ("Exchange Act") Sections 15(a) and 15(b),[4] and

---

[2]The SEC also sought injunctive relief against Mr. Thompson. After the SEC filed its motion for summary judgment, Mr. Thompson stipulated to entry of an injunction. The order reflecting the parties' agreement will be issued contemporaneously with this order.

[3]Securities Act Sections 5(a) and 5(c) are found at 15 U.S.C. §§ 77e(a) & (c) (prohibiting the direct or indirect offer or sale of unregistered securities through means of interstate commerce).

[4]Exchange Act Sections 15(a) and 15(b) are found at 15 U.S.C. §§ 78o(a)-(b) (prohibiting unregistered broker-dealer from using interstate commerce to effect or attempt to induce transactions in securities).

Securities Act Sections 17(a)(2) and 17(a)(3).[5]

The court further holds that SEC is not entitled to summary judgment on the question of liability under Securities Act Section 17(a)(1)[6] or Exchange Act Section 10(b)[7] because there exists a genuine dispute of material fact about whether Mr. Thompson had the requisite state of mind (i.e., intent to defraud). For the same reason, the court declines to impose a third tier penalty at this time.

The SEC's motion for summary judgment against Defendant Ralph W. Thompson, Jr. is GRANTED IN PART and DENIED IN PART. The court will hold an evidentiary hearing to determine whether the SEC is entitled to an order requiring Mr. Thompson to disgorge alleged ill-gotten gains, pay prejudgment interest, and pay a first or second tier penalty.

## FACTUAL BACKGROUND

### Novus Technologies, LLC and Ralph W. Thompson, Jr.

Novus Technologies, LLC ("Novus") (now in receivership) claimed to be a business consultant specializing in generating cash flow for clients. Ralph W. Thompson, Jr., was the managing member and registered agent of Novus.

Novus claimed to have developed "Money Technology," a system "designed to generate and maintain cash flow for companies to use to grow and maintain the integrity of their business

---

[5]Securities Act Section 17(a) is found at 15 U.S.C. §§ 77q(a)(2)-(3) (the anti-fraud provisions of the federal securities laws).

[6]Securities Act Section 17(a)(1), 15 U.S.C. § 77q(a)(1), requires that the fraudulent act be committed with intent to defraud.

[7]Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and its implementing Rule 10b-5 also require proof of intent to defraud.

models."[8]   According to Novus, "[t]he process is simple: a company makes a loan to Novus for a period no longer than 6-months at a time.  Novus promises to pay the company back their original principal with an agreed upon monthly interest rate."[9]  Novus further represented that the loans were "backed by an unsecured Promissory Note and that note is backed by Novus' company assets."[10]

Mr. Thompson was listed on the Novus website as the contact for the "Novus Money Technologies and Business Development" section.  He met with Novus investors and potential investors regarding Novus' business to business loan program.

Novus offered investors the opportunity to participate in a business to business loan program in which investors placed funds with Novus in exchange for a Promissory Note, Joint Venture Agreement, or verbal promise to pay a fixed rate of return to investors each month of between 3% and 5%.

Novus represented that it would generate funds to pay the monthly returns by investing in businesses in China, real estate, or other investment activity.  Mr. Thompson solicited investors through Novus' website www.novus-tech.com, referrals from current investors, and sales presentations at a local shopping mall.  He also conducted the sales presentation at a local

---

[8]Novus Website, Ex. 1 at 6; see also Thompson Dep., Ex. 50 at 56-59; Defendant Ralph Thompson's Combined Response to Plaintiff's First and Second Set of Interrogatories ("Interrogatory Response"), Ex. 62 at 37, 38, 50.

[9]See Novus Website, Ex. 1 at 6; see also Thompson Dep., Ex. 50 at 390, 395-96, 412; Interrogatory Response, Ex. 62 at 24-25, 28-29, 31, 33-38, 41-42, 44, 46; Email from Thompson to amuela@woodsidefire.org, dated 12/19/06, Ex. 70.

[10]See Novus Website Ex. 1 at 6; see also Thompson Dep., Ex. 50 at 281, 412; Interrogatory Response, Ex. 62 at 24-25, 35-36, 44, 47-48; Email from Thompson to jeff.dula@comcast.net dated 12/21/06, Ex. 72.

shopping center during which he encouraged potential investors to take out home equity lines of credit or small business loans in order to borrow money to invest.

These investment seminars were "invitation only" but were open to the general public because "invitations" could be printed from the website of Equidigm Financial Group, Inc., a Utah corporation controlled by Mr. Thompson.

Beginning in at least August 2006, Mr. Thompson met with individual investors and potential investors to describe the Novus investment program. Mr. Thompson also participated in telephone conference calls with potential investors during which he described the Novus investment program.

Mr. Thompson promised investors a monthly return between 3% and 5% if investors entered into a six-month promissory note with Novus. He told investors that their investment was secure and safer that a 401(k) or a conventional mortgage. Investors who met with Mr. Thompson were led to believe that the investment was a low or no-risk investment.

The promissory notes indicate that the funds placed with Novus would be used for further investment. Mr. Thompson executed Novus' Promissory Notes. (See Promissory Notes, Pl.'s Ex. 12.) Mr. Thompson claimed that Novus could invest client funds in various opportunities that Novus had available which would generate more money than necessary to pay the monthly interest payments owed to investors.

According to Mr. Thompson, these investments include businesses in China, real estate, S&P 500 options or futures, foreign currency futures, and stocks. He told some investors that 80% of the funds would be invested in low-risk investments and the other 20% would be at risk.. Other investors understood from Mr. Thompson that there would be no risk at all to their

principal.

Mr. Thompson also provided balance sheets and asset lists to investors and potential investors with assets including $37 billion in gold mining claims, $600,000 in cash and $7 million in marketable securities. He claimed these assets formed the security for the promissory notes investors enter into with Novus.

The assets included real estate – none of which was held in the name of Novus. The bulk of the real estate was in Duane Johnson's name. The balance sheet also failed to indicate mortgages in excess of $4 million against those properties.

The asset list Mr. Thompson provided to investors also included the Conquistador Apartments, an apartment building Novus claimed to own. But Novus does not own the Conquistador Apartments. Although Novus agreed to pay $1.5 million for a 25% interest in Conquistador Investments, LLC (the entity that actually owns the Conquistador apartment building listed on the Novus asset list), Novus did not pay Conquistador Investments, LLC the agreed upon purchase price and signed no documents to consummate the sale.

The Asset List also included $37 billion in gold mining claims in Southern Utah. Mr. Thompson provided potential investors an assay report grossly exaggerating the value, if any, of the mining claims. Mr. Thompson further claimed that Novus was undertaking efforts to commercialize the mines. That information was also false. The Bureau of Land Management has no record of anyone attempting to commercialize those mining claims.

Some investors attended seminars offered by Equidigm Financial Group, Inc. ("Equidigm"). Equidigm claims to be a financial services marketing company that generates leads for the financial services industry. Mr. Thompson was the president of Equidigm.

On its website, Equidigm offered complimentary tickets (a $75 value) to its investment seminars. Mr. Thompson was the presenter at these seminars. During the seminars (held at a Salt Lake City shopping mall), he touted Novus's investment program.

During the presentation, Mr. Thompson encouraged investors to obtain loans, usually through home equity lines of credit, to invest. After the seminars, Mr. Thompson steered investors who made further inquiries regarding specific investment opportunities to Novus.

Novus also solicited investors through its website,[11] where it stated that its program is "Too Good NOT To Be True." According to Novus, it excelled "at helping companies & corporations maximize and maintain their cash flow and profits." Novus claimed that its "Money Technologies" program would generate cash flow.[12]

Although Novus stated that an investor must be a business entity to participate in its loan program, Novus solicited individual investors who, in many cases, created business entities for sole purpose of participating in Novus' investment program.

**Mr. Thompson's Sale of Promissory Notes and Joint Venture Agreements**

Mr. Thompson told investors that they could "loan" funds to Novus through Promissory Notes. Investors were told that the minimum "loan" amount was $50,000 or $100,000, and that the notes were for a six-month term and paid between 3% and 5% interest per month. He also told investors that the funds would be used to invest in all of Novus's business activities, including manufacturing opportunities in China and Taiwan, a television station, stocks, foreign currency futures, and real estate.

---

[11]Novus also paid referral fees to individuals who referred other investors to its program.

[12]Novus Website, Ex. 1 at 5-6.

Mr. Thompson marketed Novus as a low-risk or no-risk investment. Indeed, to encourage investment, he told investors that their investments would be safer than a 401(k) plan or conventional mortgage. He told some investors that Novus would pool investors' funds with those from other individuals and invest only the interest earned on those funds. He told others that only 25% of their money would be at risk.

Mr. Thompson told other investors that Novus had liquid assets on hand to cover at least six months worth of promissory notes and so there would be no risk to investors' principal.

Novus did not ask investors whether they were accredited. Many of the investors did not meet the requirements for accreditation.

By February 2007, Novus was not generating sufficient returns on its investments to pay Novus investors their promised interest payments and, so it paid investor interest payments from funds received from new investors.[13]

Beginning in or about March 2007, Novus changed its investment program from offering Promissory Notes to Joint Venture Agreements. But the substance of the Novus investment program remained unchanged. Both programs offered a fixed rate of return for a six month period generated through investment by Novus. Furthermore, the Joint Venture Agreement, despite its title, did not require investors to do more than invest their funds.[14] Mr. Thompson is

_____

[13]SEC alleges that Mr. Thompson used $214,000 of investor money for his own personal use including payments on cars and charitable donations and $409,000 to fund Novus' operational expenses. The court will explore this allegation during the evidentiary hearing concerning disgorgement.

[14]Compare Promissory Notes, Ex. 12, with Joint Venture Agreements, Ex. 13; see also Thompson Dep., Ex. 50 at 336-37 (noting that investors continued to make loans to Novus despite the change from Promissory notes to Joint Venture agreements).

the one who executed Novus' Joint Venture Agreements.

**Material Misrepresentations and Omissions**

Mr. Thompson told investors that their investments in Novus were safe. He indicated that an investment in Novus was safer that a conventional mortgage or a 401(k) plan.

Mr. Thompson told investors that, at most, only 25% of investor funds were at risk and the balance of investor funds would be in secure investments. He also claimed that Novus had six months worth of cash reserves and that Novus remained liquid so it could pay all investors back even if some disaster were to happen.

But instead of placing investor funds in low-risk investments, Mr. Thompson placed over $2.5 million of investor funds with RCH2, LLC ("RCH2").[15] Before investing with RCH2, Mr. Thompson performed little due diligence on RCH2 or its principal Robert Casey Hall. He did not take any steps to ensure funds placed with RCH2 were safe.

RCH2 invested the majority of its funds with U.S. Ventures, LC ("US Ventures"). US Ventures placed investor funds in high-risk e-mini currencies, oil, and an S&P 500 futures trading account at Fortis Clearing America ("Fortis"). The account was controlled by US Ventures' principal Robert L. Holloway.

In November 2006, when RCH2 failed to pay an interest payment to Novus on time, Novus transferred its funds from RCH2 to US Ventures by authorizing US Ventures to perform an "accounting transfer" of funds from RCH2's US Ventures account to Novus' US Ventures

---

[15]See Promissory Note between RCH2 and Novus, Ex. 77; Interrogatory Response, Ex. 62 at 11-14; Thompson Dep., Ex. 50 at 56-62; Amended Expert Report of Gil A. Miller ("Miller Expert Rpt."), Ex. 40 at 8-9, 35.

account.[16]  Novus then transferred additional investor funds directly to US Ventures.

Before placing funds with US Ventures, Mr. Thompson did little due diligence on US Ventures or Holloway, and failed to obtain security for the funds Novus placed with US Ventures.  The agreement between Novus and US Ventures indicated the funds were to be used for e-mini futures trading, a highly risky trading strategy.

In the three months before Novus made its first investment with US Ventures, US Ventures had a combined trading loss of over $3 million. This included net losses in all three months prior to Novus' investment.  And during 2006, US Ventures lost over $9 million of investor funds.  By February 2006, US Ventures was paying interest payments to investors with new investor funds in a Ponzi scheme.

Mr. Thompson did not tell investors that US Ventures had lost over $9 million through its futures trading during the last year.  Nor did he tell investors that their interest payments represented deposits from new investors rather than from profits on investment activity.

Mr. Thompson placed the balance of investor funds, approximately $4.5 million, with Calypso Financial, LLC ("Calypso").[17]  He executed the Promissory Notes with Calypso on Novus' behalf.  But Mr. Thompson did not obtain any security for Novus' investment with Calypso.  He did not review audited financial statements from Calypso or obtain any reasonable assurances that Novus' investment was secured in any way.  In fact, when asked what steps

---

[16]Split Profits Agreement between US Ventures, LLC and Novus ("Split Profits Agreement"), Ex. 56; Thompson Dep., Ex. 50 at 90-92; Holloway Dep., Ex. 27 at 72-73, 135-36; Fax from Bryan Bailey to Duane Johnson, dated 01/15/07, Ex. 78.

[17]Calypso Promissory Notes, Ex. 39; Thompson Dep., Ex. 50 at 167-68, 326-327; Miller Expert Rpt., Ex. 40 at 10-11, 35; see also Interrogatory Response, Ex. 62 at 33-34.

Novus took to ensure that Calypso placed Novus investments into secure accounts Mr. Thompson responded: "Well, we relied on [Emma Peterson's[18]] reputation."[19]

At the time of Novus' investment with Calypso, Calypso was insolvent and unable to pay its obligations as they came due. Calypso had no revenue generating activity and used the funds transferred to it by Novus to pay overhead, operating expenses, and its obligations to earlier investors. Calypso's financial statements indicate that for the year ended December 31, 2006, Calypso incurred a net loss of $3,983,640 and a net deficit in member's equity of $4,598,848. "The Company has limited finances and requires additional funding to maintain its operations. During the year ended December 31, 2006, the company funded its operations primarily from proceeds from long-term liabilities. These factors raise doubt about the Company's ability to continue as a going concern."[20]

Mr. Thompson knew how Novus' funds were invested because he had control of the Novus' bank accounts and made the decisions regarding how Novus funds were invested. Novus did not have six months of cash reserves.

Mr. Thompson misrepresented Novus' assets to investors. That is, Novus did not have over $7,000,000 in marketable securities although its balance sheet indicated that it did.[21]

---

[18]Emma Petersen is Calypso's principal.

[19]Thompson Dep., Ex. 50 at 298.

[20]Calypso Financial, LLC Compiled Financial Statements, Ex. 42 at 10.

[21]Interrogatory Response, Ex. 62 pp. 23-24 (noting this line item as funds invested with Calypso Financial, LLC and in the S&P 500 with U.S. Ventures, LC.); see also Receiver's Fifth Status Report and Application Seeking Court Approval of Fees and Expenses Related to Novus Technologies, LLC and Related Entities, Docket #570 at 13-18 (noting the status of the Receivership's claims against Calypso Financial, LLC and U.S. Ventures, LC).

Novus did not own the real estate listed on its asset list. The homes were owned by Duane Johnson, a Novus principal. Mr. Thompson exaggerated the equity held in Johnson's homes; most were mortgaged for the full value of the properties.

The apartment building listed on Novus's asset sheet is owned by Conquistador Investments, LLC, not Novus. Although Novus entered into negotiations with Conquistador Investments, LLC to purchase a 25% interest in the LLC, Novus failed to make the required payments and no documents related to the sale were executed.

Mr. Thompson also claimed that Novus owned gold mining claims worth $37 billion. Mr. Thompson provided an assay report to potential investors valuing the gold claims at over $200,000,000,000. That claim was false.

An independent test of Novus' mining claims revealed that there are no precious metals of interest on the property.[22] According to SEC's expert, the value of "the mining claims [is] equal to the cost of locating the claims, or approximately $7,500," far less than the $37 billion Mr. Thompson claims they were worth.[23]

Even though US Ventures lost over $9 million of investor funds during that last year, Mr. Thompson authorized the transfer of investor funds to US Ventures. Mr. Thompson never asked to see a copy of the underlying account statements, a review of which would have revealed the extent of the losses.

But by March 2007, Mr. Thompson knew that US Ventures had lost Novus' funds. He made numerous demands on US Ventures for repayment of Novus' money but US Ventures

---

[22]Moran Expert Rpt., Ex. 34 at 12, 15, 22.

[23]Id. at 22.

could not pay Novus back.  Mr. Thompson did not disclose this information to investors.

In addition, Calypso was insolvent, as its financial statements revealed.  But Mr. Thompson did not review audited financial statements for Calypso or obtain security for the investment Novus made with Calypso.

## ANALYSIS

The SEC brings this civil enforcement action against Mr. Thompson under the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act").  As set forth in more detail below, the court finds, based on a review of the undisputed facts and relevant law, that Mr. Thompson sold unregistered securities, acted as an unregistered broker-dealer, and violated anti-fraud provisions of the federal securities laws.

### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if the moving party demonstrates that "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Dreiling v. Peugeot Motors of Am., Inc., 850 F.2d 1373, 1377 (10th Cir. 1988).

Rule 56(e) further states that "[w]hen a motion for summary judgment is properly made and supported, an opposing party…must—by affidavits or as otherwise provided in this rule, set out specific facts showing a genuine issue for trial."  In other words, once the moving party has

demonstrated that there are no issues of material fact in dispute, the burden shifts to the opposing

party "to come forward with specific facts showing that there remains a genuine factual issue for

trial." SEC v. Murphy, 626 F.2d 633, 640 (9th Cir. 1980).  The opposing party "must do more

than simply show that there is some metaphysical doubt as to the material facts."  Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "The mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be insufficient."

Anderson, 477 U.S. at 252.  Rather, "[t]here must … be sufficient evidence for a jury to return a

verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly

probative, summary judgment should be granted." Armbruster v. Unisys Corp., 32 F.3d 768, 777

(3d Cir. 1994).

**Liability**

1.     **The Promissory Notes and Joint Venture Agreements Sold by Novus Technologies Were "Securities."**

The promissory notes and joint venture agreements that Mr. Thompson offered and sold

are securities as either notes or investment contracts.[24]

a.     The Promissory Notes Mr. Thompson Sold are Securities Under *Reves*.

According to the United States Supreme Court, notes are presumed to be securities unless

the notes fall into certain judicially created categories that are plainly not securities or the notes

bear a family resemblance to the notes in those categories.  Reves v. Ernst & Young, 494 U.S. 56

(1990).  Under Reves, the court must consider four factors when determining whether a

_____

[24]The Joint Venture Agreements and Promissory Notes only differ in their names.  They were not different in substance.  Accordingly, the court refers to both as Promissory Notes.

particular note is a security:

> (1) the motivations that would prompt a reasonable seller and buyer to enter into [the transaction]. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security" (2) the "plan of distribution" of the instrument (3) the reasonable expectations of the investing public [and] (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

Id. at 66-67. The list of factors is not exhaustive or dispositive. Rather, the court must balance whether, on the whole, the note looks more like a security than not. In re NBW Commercial Paper Litig., 813 F. Supp. 7, 12 n.7 (D.D.C. 1992).

i.    The Motivations of the Parties

The first factor under Reves is an objective inquiry into the "'motivations that would prompt a reasonable seller and buyer to enter into' the transaction." SEC v. J.T. Wallenbrock & Assocs., 313 F.3d 532, 537 (9th Cir. 2002). A note is more like a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." Reves, 494 U.S. at 66; see also Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 812 (2d Cir. 1994) ("The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)."). Alternatively, a promissory note that "is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose" will "less sensibly [be] described as a 'security.'" Reves, 494 U.S. at 66.

Here, the first factor is satisfied. Novus investors were not provided any information

regarding any assets that purportedly backed up the Promissory Notes.  See Wallenbrock, 313 F.3d at 538 (lack of information regarding assets backing loan indicated investment for general business purposes).  In fact, the notes indicate that "[i]t is expressly understood between the parties that the Borrower shall be using the proceeds from the Note for further investments." (Promissory Notes, Ex. 12 to Pl.'s Mem. Supp. Mot. Summ. J.)  Investors understood Novus would use their funds to make further investment.  And the attractive interest rate offered to investors (a return of 3% per month or more) supports the conclusion that the Promissory Notes are securities.  See Wallenbrock, 313 F.3d at 538 (a promised interest rate above market rates suggested a security).

ii.     The Plan of Distribution

Under the second Reves factor, the court must examine the Promissory Notes' plan of distribution to determine whether the instrument has "common trading for speculation or investment." Reves, 494 U.S. at 66.  If the Promissory Notes are sold to a broad segment of the general public, then common trading has been established.  Id. at 68.

Here, Novus advertised its investment program to the general public through its website at www.novus-tech.com.  The website contained information regarding Novus' investment program and provided contact information for the company.  Novus conducted investor meetings at a local shopping mall and new investors were referred to Novus by earlier investors.  Tickets to the investor seminars were available through the web.  The Novus bank records, which show deposits exceeding $11 million from over fifty investors, further indicate that the investments were sold to a broad segment of the general public.  Under this factor, the facts support the conclusion that the Promissory Notes are securities.

iii.     The Reasonable Expectations of the Investing Public

Under the third <u>Reves</u> factor, the court must consider "whether a reasonable member of the investing public would consider these notes as investments." <u>McNabb v. SEC,</u> 298 F.3d 1126, 1132 (9th Cir. 2002). Here, the Notes specifically state that the funds will be used for further investment. And the investors understood that the monthly payments would be paid from the proceeds of that further investment because Mr. Thompson told investors their funds would be used to purchase securities, real estate and futures contracts. A reasonable investor would view such a transaction as a security purchase and, accordingly, an investment.

iv.     Reduction of Risk

The final factor to assess is whether there were adequate risk-reducing factors such as an alternative regulatory scheme that would "significantly reduce[] the risk of the instrument" to the lender, "thereby rendering application of the Securities Acts unnecessary." <u>Reves</u>, 494 U.S. at 67. Here, there were no risk-reducing factors. The Promissory Notes were unsecured and there is no evidence that they were insured. Novus's website stated that there were no guarantees or collateral specifically tied to the loan.

Uninsured and uncollateralized  notes are securities. <u>See, e.g.</u>, <u>SEC v. Cross Fin. Servs., Inc.</u>, 908 F. Supp. 718, 726 (C.D. Cal. 1995). Short of the securities laws, the investors were unprotected.

b.     <u>Because the Promissory Notes Sold by Mr. Thompson were Investment Contracts Under *Howey*, they are Securities.</u>

Investment contracts are also securities within the scope of the Securities Acts. An investment contract is a security if it involves (1) investment of money; (2) in a common

enterprise; (3) with profits derived from others' efforts.  <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293,

301 (1946).  The court concludes that the note-holders invested money with Novus.  The funds

were pooled in a common enterprise.  In fact, the Promissory Notes stated that "[i]t is expressly

understood between the parties that the Borrower shall be using the proceeds from the Note for

further investments."  (Ex. 12.)  The Novus Promissory Notes proceeds were deposited into

pooled accounts and combined with those of other investors before being transferred for further

investment.  And the profits from the investment were to be derived from the efforts of Novus.

Indeed, investors were told that Novus can pay such a high interest rate because it "earn[s] more

than [it] pay[s] out." (Novus Website, Ex. 1 at 9.)  On its website, Novus explained that it

"generate[s] a tremendous amount of money from [its] business choices."  (<u>Id.</u>)

Mr. Thompson unpersuasively contends that the promissory notes were loan agreements

and so not securities under the <u>Howey</u> test.  The Promissory Notes were "not loans for

commercial purposes, but were investment payouts disguised beneath the façade of promissory

notes. It is hard to imagine a more perfect example of the <u>Howey</u> investment contract." <u>SEC v.

Better Life Club of Am., Inc.</u>, 995 F. Supp. 167, 174 (D.D.C. 1998).  Moreover, the fact that

Novus offered a fixed rather than variable rate of return does not affect the investments' status as

a security. <u>See</u> <u>SEC v. Edwards</u>, 540 U.S. 389, 397 (2004) (analyzing <u>Howey</u> and holding "an

investment scheme promising a fixed rate of return can be an 'investment contract' and thus a

'security' subject to the federal securities laws"); <u>Stoiber v. SEC</u>, 161 F.3d 745, 750 (D.C. Cir.

1998) (holding fixed rate notes are securities); <u>Pollack</u>, 27 F.3d at 813 (noting fixed rate bonds

are regulated as securities).  Likewise, the short term of the notes has no impact on whether the

notes fall within the definition of a security.  <u>See</u> <u>Wallenbrock</u>, 313 F.3d at 540 (explaining the

exception for notes with maturity of less than nine months "applies only to commercial paper, defined by the Supreme Court as 'short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors'"); <u>Better Life Club</u>, 995 F. Supp. at 174 (holding sixty and ninety day notes were securities). These investments are securities and subject to the registration and anti-fraud provisions of the federal securities laws.

### 2. Mr. Thompson Violated the Anti-Fraud Provisions of the Securities Laws.

Section 17(a) of the Securities Act makes it unlawful

> for any person in the offer or sale of any securities . . . by the use of any means or instruments of . . . communication in interstate commerce or by the use of the mails . . . (1) to employ any device, scheme or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Scienter is an element of a Section 17(a)(1) violation but not Sections 17(a)(2) and (3). <u>See</u> <u>Aaron v. SEC</u>, 446 U.S. 680, 695-97 (1980). Scienter is also an element of Section 10(b) and Rule 10b-5 (the elements for a Section 10(b) violation are similar to those for violations of Section 17(a)(1). <u>See</u> <u>Geman v. SEC</u>, 334 F.3d 1183, 1192 (10th Cir. 2003). Because Mr. Thompson swears in his declaration that he had no knowledge of the problems presented by US Ventures, RCH2, and Calypso, the court finds that there is a genuine issue of disputed fact concerning Mr. Thompson's state of mind. Consequently, the court does not find liability under Section 17(a)(1), Section 10(b), or Rule 10b-5, but rather leaves the issue to be decided by a jury.

But the undisputed facts and law show that Mr. Thompson is strictly liable under Sections

17(a)(2) and (3).

        a.      <u>Mr. Thompson Made False Statements and Omissions.</u>

Mr. Thompson made numerous misrepresentations and omissions to Novus investors. He claimed that investor funds were safer with Novus than a 401(k) plan or a conventional mortgage. In some cases, he claimed there was no risk at all to investor funds placed with Novus. Mr. Thompson bolstered this assertion by telling investors that Novus had six months of cash on hand to pay investors in the event there was a problem. According to Mr. Thompson, at most, 25% of investor deposits were at risk. These statements were false.

Novus did not have six months of liquid assets on hand to pay back investors. Instead of placing investor funds in secure investments, Mr. Thompson transferred a large portion of investor funds to US Ventures for investment in high-risk e-mini futures trading. He invested with US Ventures without first performing basic due diligence. US Ventures lost the entire investment.

Mr. Thompson invested the balance of investor funds with Calypso, an insolvent Utah-based real estate company. Calypso used Novus' funds to pay operating expenses, overhead, and to satisfy obligations to earlier investors in Calypso. Mr. Thompson failed to obtain any security for the Novus investment with Calypso and did not review any Calypso audited financial statements or undertake any other investigation before making the investment.

Mr. Thompson did not disclose the substantial losses sustained in the US Ventures' account to investors. He did not tell investors he placed $4.5 million with Calypso without security backing the investment.

Mr. Thompson provided investors with a false and misleading asset list and balance

sheet. He falsely claimed Novus had millions in real estate assets.

Mr. Thompson also gave investors an assay report grossly exaggerating the value of Novus' mining claims. And he failed to tell investors that Novus had no revenue generating activity or that the monthly "interest" payments they received came from subsequent investors rather than from investment profits.[25]

       b.      Mr. Thompson's Misrepresentations and Omissions Were Material.

Information is material if a substantial likelihood exists that the facts would have assumed actual significance in the investment deliberations of a reasonable investor. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Misrepresentations regarding the use of investors' funds and the risk associated with the investment are material. See, e.g., SEC v. Cochran, 214 F.3d 1261, 1268 (10th Cir. 2000) ("information implicating the fair market value would be material to a reasonable investor"); Everest Sec., Inc. v. SEC, 116 F.3d 1235, 1239 (8th Cir. 1997) ("It would be material to an investor to know that the offering company's existing project had been abandoned [and] that none of its asset value was to be recouped."); CFTC v. Commonwealth Fin. Group, 874 F. Supp. 1345, 1351 (S.D. Fla. 1994) ("a representation minimizing risk or asserting there is no risk . . . would constitute a material misrepresentation").

Here, Mr. Thompson made material misrepresentations to investors. He misrepresented the risk associated with investing with Novus. He assured investors their money was safe and the Novus program had little or no risk. Mr. Thompson also misrepresented the use of investor funds

---

[25]SEC offers evidence that Mr. Thompson spent a portion of Novus funds for his own benefit. But Mr. Thompson denies that in his Declaration. Because the evidence in Mr. Miller's report is not sufficiently detailed, the court defers decision on the issue of disgorgement until an evidentiary hearing is held.

by telling investors that the bulk of their funds would be placed in secure assets. (Most investor funds went to a high-risk e-mini futures trading account or to an unsecured investment in an insolvent real estate business.) And he provided inaccurate information to investors regarding Novus assets.

Mr. Thompson also omitted material information. He failed to disclose that US Ventures lost all Novus funds. And he failed to tell investors that Novus lacked any revenue generating activities and that their returns were paid from funds deposited by subsequent investors.

c.     <u>Mr. Thompson's Misrepresentations and Omissions Were Made In Connection With the Purchase or Sale of Securities.</u>

The "in connection with" requirement is to be construed broadly and flexibly to satisfy its remedial purpose. <u>SEC v. Zandford</u>, 535 U.S. 813, 819 (2002). The "in connection with" requirement is satisfied when someone uses a device "that would cause reasonable investors to rely thereon" and "so relying, cause them to purchase or sell a corporation's securities." <u>In re Carter-Wallace, Inc. Sec. Litig.</u>, 150 F.3d 153, 156 (2d Cir. 1998) (citing <u>SEC v. Tex. Gulf Sulphur Co.</u>, 401 F.2d 833, 860-62 (2d Cir. 1968) (Section 10(b) applies "whenever assertions are made … in a manner reasonably calculated to influence the investing public")); <u>see also</u> <u>SEC v. Savoy Indus., Inc.</u>, 587 F.2d 1149, 1171 (D.C. Cir. 1978) ("In connection with" requirement is satisfied when it can reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities "regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator."); <u>In re Ames Dep't Stores, Inc. Stock Litig.</u>, 991 F.2d 953, 966 (2d Cir. 1993) ("[S]tatements which manipulate the market are connected to resultant stock trading."); <u>SEC v. Rana Research, Inc.</u>, 8 F.3d 1358, 1362 (9th Cir.

22

1993).

Mr. Thompson's conduct coincided with the sale of Novus securities. That is, his misrepresentations regarding the use of funds and risks involved occurred in the course of the sale of those securities.

       d.     <u>Mr. Thompson Used the Means and Instrumentalities of Interstate Commerce.</u>

Mr. Thompson used the means and instrumentalities of interstate commerce (e.g., mail or wire services) to carry out the above-described activities that violated Sections 17(a)(2) and (3). It is sufficient if a defendant knows that the use of mail or of wire services was a reasonably foreseeable consequence of a scheme. <u>Pereira v. United States</u>, 347 U.S. 1, 8-9 (1954). "All that is required to establish a violation of [Section 17(a)] is a showing that a means, instrumentality or facility of a kind described in the introductory language of th[e] section was used, and that in connection with that use an act of a kind described . . . occurred." <u>Matheson v. Armbrust</u>, 284 F.2d 670, 673 (9th Cir. 1960); <u>accord</u> <u>United States v. Tallant</u>, 547 F.2d 1291, 1297 (5th Cir. 1977).

Here, Mr. Thompson used the U.S. mail, the Internet, and the telephone to solicit investments. Funds were wired to US Ventures bank and brokerage accounts and to Calypso's accounts. Investors also wired funds to Novus bank accounts. Mr. Thompson used the telephone and email to communicate with investors. That is all that is required to establish the jurisdictional element of Section 17(a).

Because all four elements have been met, SEC is entitled to summary judgment on its claims of liability under Sections 17(a)(2) and 17(a)(3).

### 3. Mr. Thompson Acted as an Unregistered Broker-Dealer.

Section 15(a) of the Exchange Act prohibits a broker-dealer from using interstate commerce to effect or attempt to induce transactions in securities unless the broker-dealer is registered with the SEC under Section 15(b). SEC v. United Monetary Servs., Inc., Case No. 83-8540-CIV-Paine, 1990 U.S. Dist. LEXIS 11334, at *21 (S.D. Fla. May 13, 1990). Scienter is not an element of a Section 15(a) violation. Id.

Mr. Thompson was a broker as defined by the Exchange Act. "[S]ection 3(a)(4) of the Exchange Act defines a 'broker' as any person engaged in the business of effecting transactions in securities for the account of others." Id.; see also 15 U.S.C. § 78c(a)(4).

Mr. Thompson violated Section 15(a) by using the Internet, the telephone and other means and instrumentalities of interstate commerce to solicit investors in Novus without being affiliated with a registered broker and without being registered as a broker. Accordingly, the SEC is entitled to summary judgment on the unregistered broker claim.

### 4. Mr. Thompson Sold Unregistered Securities.

To establish a violation of the registration requirements of Section 5 of the Securities Act, the SEC must prove that Mr. Thompson directly or indirectly offered or sold securities without a registration statement. See SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 27 (10th Cir. 1972). "The elements of [an] action for violation of Section 5 are (1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 (2d Cir. 1998) (internal quotation and citation omitted).

Scienter is not an element of a Section 5 violation. <u>See</u> Aaron, 446 U.S. at 714 n.5; <u>SEC v. Johnston</u>, No. 90-4189, 1992 U.S. App. LEXIS 17626, *2-5 (10th Cir. July 28, 1992); <u>SEC v. Universal Major Indus. Corp.</u>, 546 F.2d 1044, 1046-47 (2d Cir. 1976); <u>SEC v. Lybrand</u>, 200 F. Supp. 2d 384, 392 (S.D.N.Y. 2002); <u>SEC v. Alpha Telcom, Inc.</u>, 187 F. Supp. 2d 1250, 1258 (D. Ore. 2002). Section 5 imposes strict liability on anyone who directly or indirectly violates its plain terms. <u>See</u> <u>SEC v. Friendly Power Co. LLC</u>, 49 F. Supp. 2d 1363, 1367 (S.D. Fla. 1999); <u>SEC v. DCI Telecomms., Inc.</u>, 122 F. Supp. 2d 495, 501 (S.D.N.Y. 2000) (regardless of intent defendants violated Section 5); <u>SEC v. Current Fin. Servs., Inc.</u>, 100 F. Supp. 2d 1, 5 (D.D.C. 2000) (Section 5 of the Securities Act imposes strict liability).

Mr. Thompson cannot avoid Section 5 liability based on a good faith belief that the offer or sale was legal. <u>Friendly Power Co.</u>, 49 F. Supp. 2d at 1368. He also may not rely on the advice of counsel to defend against a Section 5 claim. <u>Id.</u> The SEC need not show that Mr. Thompson was aware of anything.

Mr. Thompson sold Novus securities using the Internet and other means or instrumentalities of interstate commerce. No registration statement was in effect for those securities. Accordingly, Mr. Thompson violated Sections 5(a) and (c) of the Securities Act.

**Disgorgement, Pre-Judgment Interest, and Penalty**

The SEC asks the court to order Mr. Thompson to disgorge ill-gotten gains and pay pre-judgment interest on that amount. It is well settled that the SEC may seek, and courts may order, disgorgement of ill-gotten gains in SEC injunctive actions. <u>E.g.</u>, <u>SEC v. Manor Nursing Ctrs. Inc.</u>, 458 F.2d 1082, 1104 (2d Cir. 1972). The decision whether to order disgorgement and prejudgment interest, and in what amount, is left to broad discretion of the court. <u>SEC v. First</u>

25

Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996).

The SEC asks the court to impose a third tier penalty under Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act. See 15 U.S.C. § 77t(d)(2) (allowing for imposition of first, second, or third tier penalties); 15 U.S.C. § 78u(d)(3) (same).

A third tier penalty is appropriate where the violations (1) involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  Imposition of a third tier penalty requires a finding that Mr. Thompson acted with a high degree of scienter.  Because the court finds that Mr. Thompson's state of mind is a question of fact for the jury that may not be resolved based on the evidence before the court, the court declines to impose such a penalty at this time.

But the court will consider whether to impose a first or second tier penalty after holding an evidentiary hearing concerning disgorgement, pre-judgment interest, and civil penalties.

## Conclusion

The undisputed evidence shows that Mr. Thompson unlawfully sold unregistered securities, in violation of Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act of 1933. The undisputed evidence also demonstrates that Mr. Thompson sold securities yet failed to register as a broker-dealer with the SEC under Section 15(b) of the Securities Exchange Act of 1934 and so violated Section 15(a) of the Exchange Act.

## ORDER

For the foregoing reasons, Plaintiff Securities and Exchange Commission's Motion for

Summary Judgment against Defendant Ralph W. Thompson, Jr. (Docket No. 595) is GRANTED

IN PART AND DENIED IN PART.

DATED this 20th day of October, 2010.

BY THE COURT:

TENA CAMPBELL
Chief Judge